# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### 1:23-cr-00058-MR-WCM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND |
| | ) | RECOMMENDATION |
| JERMAINE DERRICK CARSON, JR., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court on Defendant's Motion to Suppress Evidence (the "Motion to Suppress," Doc. 26), which has been referred to the undersigned pursuant to 28 U.S.C. § 636 for the entry of a recommendation.

## I.     Relevant Procedural Background

On August 1, 2023, Jermaine Derrick Carson, Jr. ("Defendant") was indicted on one count of knowingly possessing a firearm and ammunition after having been convicted of at least one crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1). Doc. 1.

On August 23, 2023, Defendant made an initial appearance. He requested that counsel be appointed for him, and that request was granted.

On August 25, 2023, Defendant was arraigned and entered a plea of not guilty.

On December 7, 2023, Defendant filed the Motion to Suppress and a supporting memorandum, by which he moves to suppress any evidence seized

as a result of a warrantless search of Defendant that took place on May 20, 2023 following a traffic stop. Doc. 26.

Subsequently, the Government responded, and Defendant replied. Docs. 30, 35.

The undersigned conducted an evidentiary hearing on the Motion to Suppress on January 18, 2024 and took the matter under advisement. This Memorandum now follows.

## II.    Factual Background

"When material facts that affect the resolution of a motion to suppress… are in conflict, the appropriate way to resolve the conflict is by holding an evidentiary hearing after which the district court will be in a position to make findings." United States v. Taylor, 13 F.3d 786, 789 (4th Cir. 1994). In doing so, the court determines "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence." United States v. Gualtero, 62 F. Supp. 3d 479, 482 (E.D. Va. 2014) (citing United States v. McKneely, 6 F.3d 1447, 1452-53 (10th Cir. 1993)).

### A. The Evidence Presented

At the hearing, the Government called the following witnesses: Asheville Police Detective Patrick Destefano; Asheville Police Detective Brad Beddow; North Carolina Alcohol Law Enforcement Special Agent in Charge Web

2

Corthell; Asheville Police Officer Chase Hayes; and Asheville Police Detective Steven Escobedo[1].

In addition, the parties stipulated to the admission of numerous exhibits which included video footage from the body worn cameras of Detective Destefano, Officer Hayes, and Officer Escobedo, as well as various written documents. Doc. 39.

### B. Factual Findings

Based on the information of record and as presented during the hearing, the undersigned finds the relevant facts to be as follows:

On Saturday, May 20, 2023, the North Carolina Alcohol Law Enforcement agency ("ALE") and the "Impact Team" of the Asheville Police Department ("APD") conducted a joint operation in response to incidents of violent crime that had occurred in areas surrounding bars and nightclubs in Asheville.

At approximately 11:15 PM, Detective Beddow was seated in an unmarked vehicle at the Shell gas station located at 40 Merrimon Avenue when he saw a Toyota Highlander pull into the gas station's parking lot. He noticed the tag, which looked familiar to him, and that the windows of the vehicle were dark and tinted. He observed that the driver was Calvin

---

[1] At the time of the subject incident, Detective Escobedo had not yet achieved his current rank and therefore is referred to herein as Officer Escobedo.

3

Washington and that a white female was seated in the front passenger seat of the vehicle. He did not see any other occupants.

Detective Beddow recognized the license tag from surveillance he had previously conducted in the area of the Aston Gardens Apartments and the Aston Park Towers (collectively, the "Apartments") following a complaint regarding drug sales and the open carrying of firearms in the vicinity of the Apartments. That surveillance included monitoring the parking lot of the Apartments through the Apartments' video surveillance system. On Thursday, May 18 (two days before the operation), Detective Beddow saw the Highlander in the Apartments' parking lot. He was able to zoom the surveillance camera in onto the driver and identified him as Washington. He then ran Washington's name through a law enforcement database which showed that Washington's driver's license was suspended, and that Washington was on state probation.[2] He also observed a white female with Washington.

After seeing the Highlander at the gas station on May 20, Detective Beddow contacted his sergeant by phone and followed the vehicle as it left the parking lot and began travelling through Asheville. Detective Beddow's

---

[2] Detective Beddow also testified that he spoke with a probation officer, who informed him that "it would not be surprising" if Washington had a firearm. However, it was not clear from Detective Beddow's testimony when this conversation took place.

4

sergeant was communicating what was occurring to the other personnel engaged in the operation over the radio.[3]

At some point during this time (and prior to the subject stop), Detective Destefano also confirmed that Washington's license was suspended.

Detective Beddow was concerned that Washington was going to the Apartments and alerted other personnel in "stop cars" to attempt a traffic stop before the Highlander reached the Apartments; he testified that the complaint about the activity in the parking lot of the Apartments, the amount of foot traffic in the area, and his own experience with bystanders approaching traffic stops in the area gave him concerns about officer safety. At some point, Detective Beddow saw the "stop vehicles" in his rearview mirror and ceased following the Highlander.

While Detective Beddow was following the Highlander, another officer involved in the operation – Special Agent Corthell – was seated alone in an unmarked law enforcement vehicle parked on Buxton Avenue.[4] Special Agent Corthell heard radio traffic indicating that Washington had a suspended driver's license and was operating the Highlander. He realized the vehicle was approaching his location, observed the Highlander, and began following it.

---

[3] Personnel involved in the operation communicated via APD radio channel Tac 4, which was a channel that could be accessed by other law enforcement agencies such as ALE. At least some personnel also communicated via a group text message.

[4] Special Agent Corthell did not have a body worn camera or a dashboard camera.

5

Special Agent Corthell testified that he saw the vehicle accelerate quickly at one point, lean heavily at another time, and travel left of center. Special Agent Corthell testified that he waited for another officer, but one did not appear immediately and, being familiar with the area, did not want to allow the Highlander to continue toward the Apartments. He activated his blue lights shortly thereafter and the Highlander came to a stop.

Special Agent Corthell testified that although he often runs regulatory checks on a vehicle before activating his emergency equipment during a traffic stop, he did not do so in this case, and was not logged into the CJ Leads law enforcement database through his onboard computer prior to the stop.

Special Agent Corthell parked behind the Highlander and then approached the vehicle on foot on the driver side. The driver's window was partially down, and he spoke with Washington, who was in the driver's seat and provided an identification card.

Detective Destefano arrived at the scene shortly thereafter and parked behind Special Agent Corthell's vehicle. While Special Agent Corthell was speaking with Washington, Detective Destefano approached the vehicle on the passenger side and stood near the rear window. Detective Destefano spoke

6

with Defendant, who was seated in the rear of the Highlander on the passenger side, and with Jordan Presley, who was seated in the front passenger seat.[5]

Shortly thereafter, Special Agent Corthell left the driver side of the Highlander and walked back to his vehicle where, according to his testimony, he began the work associated with preparing a traffic citation for Washington, including signing into the CJ Leads system, checking Washington's driver's license status, biographical information, and criminal history, and checking the registration for the Highlander.

Detective Destefano continued speaking with Defendant and Presley. While he was doing so, Officer Hayes arrived on the scene and approached the Highlander on the driver side, which Special Agent Corthell has just left. The rear driver side window was open approximately 2 to 3 inches and Officer Hayes testified that he immediately smelled the odor of marijuana emanating from the vehicle. He then began speaking with Washington, who remained in the driver's seat.

Detective Destefano then walked back to his vehicle to run a record check on Defendant. As Detective Destefano was walking, he observed Special Agent

---

[5] Detective Destefano was wearing a body camera that was equipped with "pre-event buffering," a feature that captures 30 seconds of footage before the device is triggered to record. Though the default setting for APD body worn cameras is for pre-event buffering to be engaged, that feature was not enabled on Detective Destefano's camera at the time. Therefore, his camera did not begin recording until he turned the device on manually.

Corthell in Corthell's vehicle (where he had gone after his initial interaction with Washington).

Officer Hayes remained on the driver's side of the Highlander and talked with Washington. Officer Hayes observed that Washington had a knife and that a small digital scale was present in the vehicle. Officer Hayes initially directed Washington to toss the knife onto the floorboard, and Washington complied, but immediately thereafter asked Washington to hand the knife to Officer Hayes, and Washington complied again.

Meanwhile, Detective Destefano was checking Defendant's information, a process that revealed Defendant was flagged locally as being a violent offender and that he had a prior arrest record, though no warrants were currently outstanding for him.

At approximately the time Detective Destefano completed his checks regarding Defendant, Special Agent Corthell left his vehicle, walked to Detective Destefano's vehicle, and spoke with Detective Destefano. He first asked if Detective Destefano's body worn camera was operational; Detective Destefano stated that it was.[6] Special Agent Corthell then asked if Detective Destefano wanted to bring a drug dog to the scene. In response, Detective

---

[6] Special Agent Corthell testified that he asked this question because he has been embarrassed on previous occasions when he used profane language on camera and the footage was later played in court.

Destefano asked Special Agent Corthell if Corthell had observed "anything in the car." Special Agent Corthell replied that he had not but noted that his sense of smell was not great. Detective Destefano responded, "I've got nothing without seeing anything else."

Special Agent Corthell then began walking back toward his vehicle to obtain his "ticket book" so that he could write a traffic citation for Washington.[7]

Shortly thereafter, Officer Hayes left the Highlander and walked in the direction of Special Agent Corthell and Detective Destefano. Officer Hayes briefly informed Special Agent Corthell that he had observed a digital scale and that there was probable cause to search the vehicle. Special Agent Corthell acknowledged by stating "awesome."

Officer Hayes then continued toward Detective Destefano and informed Detective Destefano that he (Officer Hayes) had observed a digital scale and smelled marijuana such that there was probable cause to search the Highlander. Special Agent Corthell was within earshot when Officer Hayes made these statements to Detective Destefano.

During this time, Officer Escobedo arrived on the scene and also heard Officer Hayes inform Detective Destefano of what he had observed.

---

[7] Special Agent Corthell testified that, on the night in question, he was using an older style ticket book to create handwritten tickets rather than generating printed tickets using a computer.

Detective Destefano, Officer Hayes, and Officer Escobedo then approached the Highlander on the driver side. Officer Escobedo testified that, at that time, he knew that Washington had a suspended driver's license and that probable cause to search the vehicle had been developed (according to Officer Hayes).

Officer Hayes asked Washington to hand him the digital scale, and Washington did so, and Detective Destefano had Washington exit the vehicle. Officer Escobedo shined a light into the rear passenger area of the vehicle and recognized Defendant who was seated there.

Officer Escobedo testified that he had previously become aware of Defendant when investigating a complaint from the property manager at the Apartments about young males who were engaged in suspected drug activity and intimidating residents, including by carrying or brandishing firearms.[8] In response, law enforcement officers began reviewing video surveillance from the Apartments, and had identified Defendant on the footage. Defendant's background information had been checked and it was discovered that Defendant had been charged previously with armed robbery, first degree burglary, and first degree kidnapping. Law enforcement, however, never saw

---

[8] It is not clear if this is the same complaint that Detective Beddow described.

Defendant actually engage in suspected criminal activity of any kind while they observed him on the Apartments' surveillance footage.

After Officer Escobedo recognized Defendant in the Highlander, he immediately went to the passenger side of the vehicle and had Defendant step out. When Officer Escobedo opened the door, he smelled the odor of marijuana emanating from the vehicle. He testified that he also noticed that Defendant was shaking and nervous and was whispering, which he found to be abnormal.

Officer Escobedo testified that he then asked Defendant if he had any weapons, to which Defendant whispered something Officer Escobedo could not understand, and had Defendant place his hands on the Highlander. Defendant's pants were sagging, and Officer Escobedo tried to pull them up; in doing so, Officer Escobedo noticed that some object was weighing Defendant's pants down. He then told Defendant to spread his feet, and Defendant responded that he had a firearm. Officer Escobedo retrieved the firearm from Defendant's person, determined it was loaded, and secured it.

## III.   Analysis

Defendant makes two arguments – first that the traffic stop was unlawfully extended and second that the frisk of his person was improper.

### A. The Traffic Stop

"A traffic stop constitutes a seizure under the Fourth Amendment and is subject to review for reasonableness." United States v. Hill, 852 F.3d 377, 381

(4th Cir. 2017) (internal quotation marks omitted). "Because a traffic stop is more akin to an investigative detention than a custodial arrest, . . . the constitutionality of such a stop" is analyzed "under the two-prong standard enunciated in <u>Terry v. Ohio</u>, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)." <u>United States v. Williams</u>, 808 F.3d 238, 245 (4th Cir. 2015). Specifically, courts consider "(1) if the stop was legitimate at its inception, and (2) if the officer's actions during the seizure were reasonably related in scope to the basis for the traffic stop." <u>United States v. Bowman</u>, 884 F.3d 200, 209 (4th Cir. 2018) (internal quotations and citations omitted).[9]

"A seizure for a traffic violation justifies a police investigation of that violation." <u>Rodriguez v. United States</u>, 575 U.S. 348, 354 (2015). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." <u>Id</u>. <u>See also</u> <u>Illinois v. Caballes</u>, 543 U.S. 405, 407 (2005) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission"); <u>United States v. Shakur</u>, 452 F.Supp.3d 438, 444 (E.D. Va. 2020) ("once the tasks related to the traffic infraction are finished, the stop becomes an unlawful seizure if it is extended for even a 'de minimis' amount of time") (quoting <u>United States v.</u>

---

[9] Here, Defendant does not argue that the stop was improper at its inception.

12

Bowman, 884 F.3d 200, 210 (4th Cir. 2018)); Rodriguez, 575 U.S. at 355 ("Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance") (internal citations omitted).

A law enforcement officer may prolong a stop beyond its original purpose, but only with additional authorization; "an officer cannot investigate 'a matter outside the scope of the initial stop' unless he receives the motorist's consent or develops reasonable, articulable suspicion of ongoing criminal activity." U.S. v. Palmer, 820 F.3d 640, 649-50 (4th Cir. 2016) (citation omitted); Rodriguez, 575 U.S. at 355 (an officer may not conduct unrelated checks "in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual").

"Reasonable suspicion is a 'commonsense, nontechnical' standard that relies on the judgment of experienced law enforcement officers, 'not legal technicians.'" Palmer, 820 F.3d at 650 (quoting Ornelas v. United States, 517 U.S. 690, 695 (1996) (internal quotation marks omitted)). "[T]he factors supporting reasonable suspicion during a traffic stop 'must in their totality serve to eliminate a substantial portion of innocent travelers,' and also demonstrate a connection to criminal activity." Id. (quoting United States v.

13

<u>Williams</u>, 808 F.3d 238, 246 (4th Cir. 2015) (some internal quotation marks omitted)).

In this case, Defendant contends that Special Agent Corthell departed from the mission of the traffic stop, which was traffic enforcement.

### 1. Special Agent Corthell's Actions Upon Returning to His Vehicle

Initially, Defendant contends that Special Agent Corthell's testimony that he, upon returning to his vehicle, began the process of running ordinary record checks in order to prepare a traffic citation for Washington should not be accepted as credible in light of inconsistencies and errors in other portions of his testimony and, therefore, that there is no evidence that Special Agent Corthell remained focused on the mission of the stop. That is, Defendant essentially urges the Court to view the testimony of Special Agent Corthell through the lens of the maxim *falsus in uno, falsus in omnibus* ("false in one thing, false in all"). <u>See</u> <u>e.g.</u>, <u>Li v. Holder</u>, 738 F.3d 1160, 1163 (9th Cir. 2013) ("*Falsus in uno, falsus in omnibus* is a hoary maxim which allows a fact-finder to disbelieve a witness's entire testimony if the witness makes a material and conscious falsehood in one aspect of his testimony."); <u>see also</u> <u>Holland v. Washington Homes, Inc.</u>, 487 F.3d 208, 223 (4th Cir. 2007).

Some of the information in Special Agent Corthell's written report, which was dated July 5, 2023, and his related testimony is problematic.

14

First, Special Agent Corthell wrote in his report that "covert surveillance" had stated "they" had observed Defendant "whom they received information was regularly carrying a firearm, riding with Washington" and that Special Agent Corthell "heard radio traffic identify Carson as a convicted felon." Doc. 26-6 at 2.

However, the Government's evidence did not support that statement. Detective Beddow, who was acting in an undercover capacity on the day in question, was the only individual identified by the Government as being the "covert surveillance" referenced by Special Agent Corthell. Detective Beddow transmitted information (through his sergeant) that Washington's driver's license was suspended, but he did not broadcast information regarding Defendant; Detective Beddow testified that he did not even know Defendant was in the Highlander when it left the gas station.

In addition, no witness corroborated the statement in Special Agent Corthell's written report that information regarding Defendant was published over the radio, or via text, prior to the traffic stop.

Second, in his written report, Special Agent Corthell stated that he began preparing a written citation for Washington and that, "[w]hile doing so," he overheard other officers state that they had observed drug paraphernalia in the vehicle. Doc. 26-6 at 2.

15

The evidence presented during the hearing, though, indicated that Special Agent Corthell received information about the development of probable cause (from Officer Hayes directly and from overhearing Officer Hayes speak to Detective DeStefano) not while Special Agent Corthell was actually writing a traffic citation for Washington, but after Special Agent Corthell had spoken with Detective DeStefano about the possibility of using a drug dog and while Special Agent Corthell was looking for his ticket book.

Third, Special Agent Corthell's written report states that he moved the Highlander to a parking area at "their request." Doc. 26-6 at 3. During the hearing, Special Agent Corthell testified that the vehicle was moved at the request of Washington and the registered owner (who was a third party). However, body worn camera footage presented by the Government showed that it was Washington, not Special Agent Corthell, who moved the vehicle.

These inaccuracies are troubling.[10]

Nonetheless, the undersigned finds other portions of Special Agent Corthell's written report and testimony to be credible and consistent with information given by other witnesses.

---

[10] Under cross-examination, Special Agent Corthell acknowledged that, after meeting with federal prosecutors, he became aware of issues with his report, was now "less convinced" that his report was entirely accurate and could not say where certain information originated. However, he never amended his report.

16

Significantly, the undersigned finds Special Agent Corthell's testimony regarding the actions he undertook when he returned to his vehicle after his initial interaction with Washington – specifically that he performed tasks associated with an ordinary traffic stop – to be credible. Detective Destefano's testimony and body worn camera footage confirmed that Special Agent Corthell was in his vehicle at that time and, though the Government did not present evidence that corroborated Special Agent Corthell's testimony about his specific actions inside his vehicle (such as information showing the time at which Special Agent Corthell logged into CJ Leads or the checks he ran), Defendant has not argued that Special Agent Corthell was in his vehicle for an amount of time longer than necessary to complete these ordinary tasks. Special Agent Corthell's position as a supervisor and his numerous years of experience in law enforcement are also noted.

### 2. Diversion to Speak with Detective Destefano

The next issue is whether Special Agent Corthell's conversation with Detective Destefano constituted an improper diversion from the mission of the stop. More precisely, the question is whether law enforcement had developed probable cause to search the Highlander before Special Agent Corthell walked over to speak with Detective Destefano. The answer requires an analysis of Officer Hayes' testimony.

Officer Hayes testified that he smelled the odor of marijuana emanating from the Highlander when he first approached the vehicle and when his "nose was equal with that gap in the back window." His position near the vehicle is shown by his body camera footage.

According to that footage and his testimony, this observation by Officer Hayes occurred approximately a minute and a half prior to the time that Special Agent Corthell went to speak with Detective Destefano. In other words, if the testimony of Officer Hayes is believed, law enforcement did develop probable cause to search the vehicle before Special Agent Corthell walked over to speak with Detective Destefano such that the stop could have been prolonged at that point for the vehicle to be searched (even if Special Agent Corthell's conversation with Detective Destefano could be seen as a diversion from the mission of the traffic stop). See Palmer, 820 F.3d at 650 ("While checking the Nissan's inspection sticker, Officer Ring smelled marijuana. At that point, he had probable cause to believe the vehicle contained contraband, and was therefore entitled to search it. Thus, unless Palmer can demonstrate some constitutional violation between the time the stop began and the point that Ring smelled marijuana, the evidence cannot be suppressed.") (internal citations omitted).

The undersigned does find Officer Hayes' testimony to be credible on this point.

While neither Special Agent Corthell nor Detective Destefano identified an odor of marijuana when they initially approached the vehicle, Special Agent Corthell testified that, at the time of the stop, he was recovering from COVID and had lost his sense of smell. Further, footage from Detective Destefano's body worn camera shows that, when he approached the passenger side of the vehicle and spoke with Defendant and Presley, he did not appear to be as close to the vehicle as Officer Hayes later would be.

In addition, Officer Escobedo testified that when he opened the door to the vehicle to remove Defendant, he also smelled the odor of marijuana coming from inside the Highlander.

### B. The Frisk of Defendant

Next, Defendant contends that he was frisked unlawfully. Thus, the question presented on this point is whether Officer Escobedo had reasonable suspicion to believe that Defendant was armed and dangerous. Arizona v. Johnson, 555 U.S. 323, 327 (2009) ("To justify a patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous").[11]

---

[11] As an initial matter, the Government contends that there was probable cause to search the vehicle, and that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." Maryland v. Wilson, 519 U.S. 408, 415 (1997). It does not appear, however, that Defendant is contesting (in the event

The Government argues that reasonable suspicion existed because Defendant's pants were weighed down, he had a violent criminal history and was flagged in APD's database as being potentially dangerous and a violent offender, the officers had an objectively reasonable suspicion that drugs were in the vehicle, and the stop occurred at night in a high crime area.

With respect to Defendant's clothing, the Government does not argue that his "baggy" pants alone would have justified a frisk. See e.g., United States v. Gillam, 520 F.3d 844, 848 (8th Cir. 2008) ("Gilliam further asserts that his baggy clothing could not create reasonable suspicion that he was armed and dangerous because that fact also applies to a large proportion of the black male population. We grant that Gilliam's attire alone would not necessarily have created a reasonable suspicion that he was armed and dangerous"). Rather, the Government asserts that Defendant's pants were weighed down and were difficult to pull back up due to the weight of a concealed weapon. Specifically, during the hearing, Officer Escobedo testified that Defendant's pants were sagging "well below the hip area," "almost down

_____

probable cause existed to search the Highlander) that the officers improperly asked the occupants of the vehicle to step out of the Highlander.

to his knees," and that when he (Officer Escobedo) attempted to pull them up for Defendant, he felt something weighing them down.[12]

Additionally, Officer Escobedo testified that he immediately recognized Defendant when he approached the Highlander based on his investigation of the complaint involving potential drug and firearm activity at the Apartments, that he had previously run Defendant's criminal history, which showed Defendant had been charged with armed robbery and was "flagged as violent," and that he considered his interaction with Defendant to be a "known risk encounter." Although Defendant's past criminal history, standing alone, was not sufficient to justify a frisk of Defendant, Officer Escobedo was entitled to consider that history when determining whether there was reasonable suspicion to believe that Defendant was armed and dangerous. See United States v. Sprinkle, 106 F.3d 613, 617 (4th Cir. 1997) ("A prior criminal record "'is not, standing alone, sufficient to create reasonable suspicion.' 'Nevertheless, an officer can couple knowledge of prior criminal involvement with more concrete factors in reaching a reasonable suspicion of current criminal activity.") (internal citations omitted); United States v. Foster, 634 F.3d 243, 247 (4th Cir. 2011) (noting that criminal history can be a relevant

---

[12] A "frisk" occurs when a police officer conducts a cursory search "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry, 392 U.S. at 29. For purposes of this analysis, the undersigned assumes that a frisk of Defendant actually occurred.

factor when paired with "more 'concrete factors' to demonstrate that there was a reasonable suspicion of current criminal activity") (citations omitted).

Further, Officer Escobedo testified that, prior to approaching the Highlander, he knew that probable cause to search the vehicle existed based on the observation by Officer Hayes, and that when he opened the rear passenger door for Defendant, he smelled the odor of marijuana himself. See United States v. Sakyi, 160 F.3d 164, 169 (4th Cir. 1998) ("we hold that in connection with a lawful traffic stop of an automobile, when the officer has a reasonable suspicion that illegal drugs are in the vehicle, the officer may, in the absence of factors allaying his safety concerns, order the occupants out of the vehicle and pat them down briefly for weapons to ensure the officer's safety and the safety of others"); see also United States v. Harris, 2023 WL 5165273, at *1 (4th Cir. Aug. 11, 2023) (unpubl.) ("because there is an 'indisputable nexus between drugs and guns,' the district court also correctly concluded that the officers had reasonable suspicion that Harris was armed and dangerous") (citing Sakyi).

Finally, the traffic stop occurred at night, and all officers testified during the hearing that the stop occurred in an area about which they had heightened

safety concerns.[13] See U.S. v. George, 732 F.3d 296, 299 (4th Cir. 2013) ("A host of factors can contribute to a basis for reasonable suspicion, including the context of the stop, the crime rate in the area, and the nervous or evasive behavior of the suspect").

Based on all of the above, the undersigned is persuaded that Officer Escobedo had reasonable suspicion that Defendant was armed and dangerous sufficient to justify a frisk of Defendant.

## IV. Recommendation

Based on the foregoing, the undersigned respectfully **RECOMMENDS** that Defendant's Motion to Suppress (Doc. 26) be **DENIED**.

Signed: 2/23/2024

W. Carleton Metcalf
United States Magistrate Judge

---

[13] Officer Escobedo also testified that Defendant was nervous and shaking when he exited the vehicle. However, these facts are not immediately evident from Officer Escobedo's body camera footage.

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(B), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140 (1985).